UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY | CIVIL ACTION |
| | NO. 18-4402 |
| VERSUS | |
| | SECTION M (3) |
| JARONET S. WHITAKER | |

**<u>ORDER & REASONS</u>**

Before the Court is a motion by plaintiff American General Life Insurance Company ("AGLIC") for summary judgment seeking a declaration that it properly denied defendant Jaronet S. Whitaker's claim for proceeds under the accidental death benefit rider on the policy insuring the life of her deceased son Armand Jarion Brown.[1] Whitaker opposes the motion,[2] and AGLIC filed a reply memorandum in further support of it.[3] Having considered the parties' memoranda, the applicable law, and the record, the Court finds that AGLIC properly denied Whitaker's claim because Brown was the aggressor in the incident that led to his death, meaning that his death was not accidental.

**I.    BACKGROUND**

This case involves an insurer seeking a declaratory judgment that it properly denied accidental death benefits to the beneficiary of a life insurance policy. In 2012, Whitaker obtained a life insurance policy and accidental death benefit rider on Brown, and named herself

---

[1] R. Doc. 26.
[2] R. Doc. 28. AGLIC's motion was set for submission on August 29, 2019. R. Doc. 26-14. Pursuant to Local Rule 7.5 of the United States District Court for the Eastern District of Louisiana, which requires that a memorandum in opposition to a motion be filed no later than eight days before the noticed submission date, Whitaker's opposition was due on August 21, 2019. Whitaker filed her deficient opposition on August 22, 2019, and remedied the deficiency on August 27, 2019. R. Docs. 27 & 28. AGLIC urges the Court to not consider Whitaker's untimely opposition. R. Doc. 31 at 1-2. Although Whitaker was tardy in filing her opposition, AGLIC was not prejudiced by the late filing because this Court granted AGLIC leave to file a reply memorandum. R. Docs. 30 & 31. Therefore, the Court will consider Whitaker's opposition.
[3] R. Doc. 31.

as the policy owner and beneficiary.[4] The accidental death benefit rider provides that AGLIC would pay Whitaker an extra benefit if Brown's death was caused by an accident.[5] "Accidental death" is defined in the policy as:

> death that (a) resulted directly, and independently of all other causes, including but not limited to disease or mental infirmity, or medical or surgical treatment from accidental bodily injury sustained while the Covered Insured's coverage under this rider was in force; and (b) occurred within 120 days after the injury.[6]

The coverage is also subject to the following exclusions:

> [AGLIC] will not pay any Accidental Death Benefit if the Covered Insured's death is directly caused by accidental bodily injury incurred by the Covered Insured in an accident where the Covered Insured was operating any type of land, water, or air vehicle while having a blood alcohol content at or above the level made illegal by statute for the operation of such a vehicle or if the Covered Insured's death is caused or contributed to by:
>
> (a)     intentional self-inflicted injury, while sane or insane;
>
> (b)     commission of or attempt to commit an assault or felony;
>
> (c)     engaging in an illegal occupation;
>
> (d)     participation in an insurrection or war, whether declared or not;
>
> (e)     an excitant, depressant, hallucinogen, narcotic or other drug, unless taken as prescribed by a licensed physician; or
>
> (f)     flight in or descent from or with any aircraft in which the Covered Insured was the pilot or a crew member, was giving or receiving training or instruction or had any duties.[7]

On January 23, 2017, Brown was shot and killed by a Kenner police officer.[8] The events leading up to Brown's death were explained by this Court in a prior order:

> On the morning of January 23, 2017, at 11:02 a.m., the Kenner Police Department received a call from Joshua Brown, Jairon Brown's half-brother. Joshua told the dispatcher that his half-brother was "swinging a knife" at him when Joshua tried

---

[4] R. Doc. 1 at 2.
[5] *Id.* at 2-3.
[6] R. Doc. 26-9 at 28.
[7] *Id.*
[8] R. Doc. 1 at 3.

2

to enter the house in which the brothers resided. Joshua later testified that when he arrived home, Jairon went to the kitchen, retrieved a knife, and started "showing" the knife to him. The brothers' father, Armond Brown, Sr., who lived in the same house, testified that when Joshua came home, Jairon "had a knife in his hand[ ] and told Joshua to roll out."

At least two Kenner police officers arrived at the scene, spoke with Joshua, and then approached the front door of the residence to attempt to make contact with Jairon. When these attempts were unsuccessful, the police officers told Joshua that in order to get help for his brother, he had to obtain an order for protective custody from the Jefferson Parish coroner. Joshua left the residence with an officer to sign the necessary paperwork, and the coroner's office issued the order for protective custody shortly before 1:30 p.m. The order authorized the police officers to remove Brown from his home and take him to Ochsner Hospital in Kenner for an immediate psychiatric examination.

More police officers had arrived at the scene by the time the order was formally issued. The officers established a secure perimeter around the house and an outer perimeter on the street to control traffic and bystanders. Officer Ronnie Barger, the Kenner SWAT team negotiator, first attempted to contact Brown by telephone. When that proved unsuccessful, Officer Barger used a bullhorn to attempt contact. Officer Barger asked Brown to leave the residence and told him that the police wanted to help him.

Members of the Kenner SWAT team then attempted to breach the front door of the house in order to make visual contact with Brown. When the officers opened the front door, they observed Brown standing near the door with two knives in his hands and in a "squatted" or "defensive" stance. Some of the officers described Brown as having a "thousand-yard" or "blank" stare on his face. The officers instructed Brown to drop his knives, but he did not comply. The officers then fired sponge rounds and a Taser at Brown. The sponge rounds hit Brown in the thigh area but did not incapacitate him. The Taser fire directly hit him, but it likewise had little effect.

After these attempts to incapacitate Brown, the Kenner Police Department fired tear gas into the house. Brown exited the front door of the house shortly after the officers deployed the tear gas. He was holding both knives and wiping his eyes with his sleeves. A brick wall lines much of the Browns' front yard. A footpath extends from the Browns' front door to a pedestrian gate that opens to the sidewalk. Officers Romano and Brent Donovan were inside the brick wall in the front yard when Brown emerged from the house. Both officers were to Brown's right and armed with rifles containing live ammunition. Officers Lewis Tusa and John Cusimano positioned themselves inside the gateway at the end of the footpath, not protected by the brick wall. Neither officer was armed with lethal ammunition – Officer Tusa had a Taser gun, and Officer Cusimano had sponge rounds. There is inconsistent testimony regarding whether the pedestrian gate was closed in front of Officers Tusa and Cusimano when Brown emerged from

3

the house. There is also inconsistent testimony regarding whether, if closed and separating the officers from Brown, the pedestrian gate was locked so that Brown would have been unable to open it to attack the officers.

Brown, armed with both knives, began to walk down the footpath toward Officers Tusa and Cusimano, yelling bible verses. Officers Donovan and Romano walked parallel to Brown alongside the brick wall to Brown's right. The Kenner police officers repeatedly ordered Brown to drop his knives, but he refused. Brown stopped when he was about halfway between the front door and Officers Tusa and Cusimano. The police officers continued to give him verbal commands to drop the knives. A short time later, Brown continued down the footpath. When he got closer to them, Officers Tusa and Cusimano each fired their non-lethal ammunition. Shortly after they fired, Officer Romano fired multiple lethal rounds, killing Brown. Officer Romano testified that when he fired his weapon, Brown's arms were "near his side with his hands out front," and both knives were "vertical in the air." Officer Romano further stated that Brown was not attempting to strike Officer Tusa or Cusimano when he fired. Officer Donovan testified that Brown was "within an arm's reach" of the pedestrian gate when Officer Romano fired. Joshua Brown testified that at the time his brother was shot he was about seven or eight feet from the front gate where Officers Tusa and Cusimano stood. Cynthia Morell, a neighbor who witnessed the incident, stated in a sworn affidavit that Brown was "about ten feet from the front gate."

Photographs taken by the Kenner Crime Scene Technician show that one of Brown's knives was a stainless steel serrated kitchen knife with a seven-inch blade. The other knife was a stainless steel kitchen knife with a five-inch blade.

*Brown v. Kenner Police Dep't*, 2018 WL 5251912, at *1-3 (E.D. La. Oct. 22, 2018) (Vance, J.) (citations omitted) ("civil action no. 17-3445").

Civil action no. 17-3445 was a suit brought by Brown's parents and brothers against Officer Romano and the City of Kenner asserting state law claims for wrongful death, survival, and intentional infliction of emotional distress, and federal civil rights claims under 42 U.S.C. § 1983. *Brown v. Kenner Police Dep't*, 2018 WL 5251912, at *3. The *Brown* plaintiffs contended that Brown was wrongfully shot and killed without just cause. *Id.* On October 22, 2018, this Court granted defendants' motion for summary judgment holding that "Officer Romano's use of deadly force was not clearly unreasonable because he reasonably feared that Brown posed an immediate threat to the safety of Officers Tusa and Cusimano." *Id.* at *6. To reach this

conclusion, the Court examined the summary judgment evidence in the light most favorable to the plaintiffs, which led to the following picture of the incident:

> Officer Romano arrived at the scene after being notified that Brown had barricaded himself in his home, that Brown was armed with two knives, and that Brown was reportedly schizophrenic. Officer Romano was aware that Kenner police officers had fired non-lethal munitions at Brown, but that those munitions failed to incapacitate him. Officer Romano then observed Brown, still armed with two knives, leave his residence and haltingly walk down the footpath towards Officers Tusa and Cusimano after the Kenner police department deployed tear gas into his home. When Officer Romano fired his weapon, Brown was ten feet from Officers Tusa and Cusimano and advancing, armed with two knives, and refusing to comply with the officers' repeated commands to drop his weapons. … Officers Tusa and Cusimano were positioned immediately behind a pedestrian gate that Officer Romano believed would swing open and not protect the officers. Finally, Officer Romano testified – and plaintiffs have not clearly refuted with contrary evidence – that Brown was holding the knives in front of his body with the blades extended vertically.

*Id.* at *5 (citations omitted). Further, the Court concluded that there could not be municipal liability on the part of the City of Kenner in the absence of a constitutional violation, and it declined to exercise supplemental jurisdiction over the remaining state law claims. *Id.* at *9-10.

On February 1, 2017, AGLIC received Whitaker's notice of claim on Brown's life insurance policy.[9] AGLIC paid the death benefit, but investigated Whitaker's claim under the accidental death benefit rider.[10] On August 3, 2017, AGLIC informed Whitaker via letter that it was denying her claim under the accidental death benefit rider because Brown's death was caused or contributed to by the commission of, or attempt to commit, an assault or felony.[11] AGLIC noted that, although Brown's death certificate states that the manner of death was homicide immediately caused by distant range gunshot wounds to the abdomen groin and lateral hip, the police report revealed that Brown was advancing toward officers while armed with

---

[9] R. Doc. 1 at 4.
[10] *Id.*
[11] R. Doc. 1-2 at 1.

5

knives when the shooting occurred, thus precluding AGLIC's liability under the accidental death benefit rider.[12]

On March 29, 2018, Whitaker's counsel requested that AGLIC reconsider its decision, and threatened legal action if AGLIC did not pay the accidental death benefit rider.[13] In response, on April 28, 2018, AGLIC filed this action seeking a declaration that it properly denied Whitaker's claim.[14]

## II. PENDING MOTION

AGLIC filed the instant motion for summary judgment arguing that the undisputed material facts as explained in *Brown v. Kenner Police Dep't*, 2018 WL 5251912, at *1-3 (E.D. La. Oct. 22, 2018) (Vance, J.), prove that it properly denied Whitaker's claim under the accidental death benefit rider.[15] First, AGLIC contends that Brown's death was not caused by an "accident" under Louisiana law because Brown was the aggressor in the confrontation that culminated in his death.[16] Second, AGLIC argues that the criminal acts exclusion applies because Brown was engaged in an aggravated assault on a peace officer at the time of his death.[17]

Whitaker argues that AGLIC's motion is premature because there are outstanding discovery issues.[18] Whitaker thus contends that the motion should be denied, or a ruling deferred, until the discovery issues are resolved.[19] Further, Whitaker argues that both she and

---

[12] *Id.*
[13] R. Doc. 1-3.
[14] R. Doc. 1.
[15] R. Doc. 26-1.
[16] *Id.* at 8-11.
[17] *Id.* at 11-13.
[18] R. Doc. 28.
[19] *Id.* at 3-5. Rule 56(d) of the Federal Rules of Civil Procedure provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." To obtain relief under Rule 56(d), the party opposing summary judgment must "set forth a plausible basis for believing that specified facts, susceptible of collection within a

6

Brown's father testified in their personal injury suit that Brown was not a danger to anyone at the time of his death.[20]

## III. LAW & ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record

---

reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) (quotation omitted). Whitaker fails to include an affidavit or explain in any way exactly what she hopes to obtain from discovery and how those facts would affect the pending motion. Moreover, considering the thorough explanation in *Brown* of the facts surrounding Brown's death, this Court is skeptical that there are undiscovered facts relevant to the present motion. Therefore, the Court denies Whitaker's inadequate Rule 56(d) request.

[20] *Id.* at 1-3.

taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

## B. Insurance Policy Interpretation

Under Louisiana law, an insurance policy, like any other contract, is construed according to the general rules of contract interpretation set forth in the Louisiana Civil Code. *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003) (citations omitted). Contracts are interpreted to determine "the common intent of the parties." *Id.* (citations omitted). "Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Id.* (citations omitted). An insurance policy "should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." *Id.* (citations omitted). A court cannot exercise "inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent." *Id.* (citations omitted). Thus, clear and unambiguous policy wording that expresses the parties' intent is enforced as written. *Id.*

Ambiguous provisions and "equivocal provisions seeking to narrow an insurer's obligation," on the other hand, are strictly construed against the insurer and in favor of coverage. *Id.* (citations omitted). However, the strict construction principle applies only if the ambiguous policy provision is susceptible of more than one reasonable interpretation. *Id.* (citations omitted). "[T]he insurer has the burden of proving the applicability of a coverage exclusion." *Hampton v. Lincoln Nat'l Life Ins. Co.*, 445 So. 2d 110, 113 (La. App. 1984). "The determination of whether a contract is clear or ambiguous is a question of law." *Cadwallader*, 848 So. 2d at 580.

## C. Accidental Death Benefits

A claimant seeking to recover proceeds from accidental death benefit coverage has the initial burden of establishing that the insured's primary cause of death was "accidental." *Dugas v. Travelers Ins. Co.*, 785 F.2d 550, 551 (5th Cir. 1986) (citing *Johnson v. Nat'l Life & Accident Ins. Co.*, 331 So. 2d 87, 88 (La. App. 1976)). Generally, if the "insured's death was not a natural death or a suicide[,] the court must then infer that the death was accidental." *Id.* (citing *Willis v. Willis*, 287 So. 2d 642, 645 (La. App. 1973)). If an accidental death is proved, "the burden shifts to the insurer to show by 'a preponderance of the evidence that such insurer is nevertheless not liable by reason of a special defense or an exclusionary clause of the policy in question.'" *Id.* (quoting *Willis*, 287 So. 2d at 645).

One special defense available to the insurer is that the death was not accidental within the meaning of the policy. *Id.* Under Louisiana law, it is well established that an insured's death is not accidental if he is killed in a situation in which he was the aggressor. *Id.* at 551-52 (citing *Cutitto v. Metro. Life Ins. Co.*, 168 So. 761, 762 (La. 1936) ("[it] is well established that where the insured is intentionally injured by another, and the injury is not the result of misconduct or an assault by the insured, but is unforeseen, in so far as he is concerned, the injury is accidental within the meaning of an accident policy"); *Barham v. State Life Ins. Co. of Ind.*, 135 So. 730 (La. App. 1931) (holding that insured's death in a fight, while not explicitly excluded from coverage, was not "accidental" within double indemnity provision of policy as insured was the aggressor in the fight); *Thom v. Metro. Life Ins. Co.*, 2 So. 2d 269 (La. App. 1941) (holding that the insured death was not "accidental" where he was an aggressor who assaulted his opponent with a deadly weapon)). In *Bowman v. Inter-Ocean Ins. Co.*, 241 So. 2d 579 (La. App. 1970), the court held that the insurer properly denied benefits under an accidental death policy when the insured was the aggressor in a shooting that caused his death, because "[t]he law is clear that if

an insured is an aggressor and his actions precipitate his death there can be no recovery under the policy." *Id.* at 580; *see also Lemay v. Life Ins. Co. of Sw.*, 688 F. Supp. 1118, 1119 (W.D. La. 1988) (accord). The insurer must prove by a preponderance of the evidence that the insured was the aggressor. *Lemay*, 688 F. Supp. at 1120 (citing *Dugas*, 785 F. 2d at 551; Fed. R. Evid. 302).

In this case, the summary judgment evidence here and the undisputed record in civil action no. 17-3445 establish that Brown was the aggressor in the situation that led to his death. Brown's brother called the police after Brown threatened him with a knife. Brown was non-compliant with the officers' directives when they were trying to take Brown into protective custody for an immediate psychiatric examination pursuant to the Jefferson Parish coroner's order. Immediately preceding the shooting, Brown continued to threaten officers with knives after tear gas and non-lethal weapons failed to subdue him. When Officer Romano fired his weapon, Brown was ten feet from Officers Tusa and Cusimano and advancing, armed with two knives, and refusing to comply with the officers' repeated commands to drop his weapons. Under these circumstances, Brown was clearly the aggressor. Whitaker has not presented any competent summary judgment evidence to refute these facts. Thus, Brown's death was not "accidental" within the meaning of the policy, and AGLIC properly denied Whitaker's claim under the accidental death benefit rider.

      D.      **Criminal Activity Exclusion**

AGLIC also contends that, even if Brown's death were accidental, it properly denied benefits under the criminal acts exclusion because Brown was arguably committing the offenses of assault and felony aggravated assault of a peace officer when he was killed.[21] "Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." La. R.S. 14:36. "Aggravated assault upon a peace officer is an assault

---

[21] R. Doc. 26-1 at 11-14.

committed upon a peace officer who is acting in the course and scope of his duties." La. R.S. 14:37.2. "Aggravated assault is an assault committed with a dangerous weapon." La. R.S. 14:37.

Again, the undisputed record establishes that Brown was advancing on Officers Tusa and Cusimano with knives at the time he was shot. These actions arguably constitute assault and aggravated assault of a peace officer. Whitaker argues that Brown was not charged with a crime.[22] However, the state's filing criminal charges is not a prerequisite for the exclusion to apply because "the state cannot prosecute a dead man." *James v. La. Laborers Health & Welfare Fund*, 29 F.3d 1029, 1034 (5th Cir. 1994) (quoting *Berg v. Bd. of Trustees, Local 705 Int'l Bro. of Teamsters Health & Welfare Fund*, 725 F.2d 68, 70 (7th Cir. 1984)). Therefore, AGLIC also properly denied Whitaker's claim for accidental death benefits pursuant to the criminal acts exclusion.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that AGLIC's motion for summary judgment (R. Doc. 26) is GRANTED.

New Orleans, Louisiana, this 25th day of September, 2019.

                                             _____
                                             BARRY W. ASHE
                                             UNITED STATES DISTRICT JUDGE

---

[22] R. Doc. 28 at 1.